UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

RYLEE SILVA-VIDINHA, as Personal
Representative of the ESTATE OF
STARSHA SILVA, and on her own behalf,

            Plaintiff,

-against-

UNITED STATES OF AMERICA;
FEDERAL BUREAU OF PRISONS;
WARDEN MICHAEL SEGAL (FCI
WASECA), in his individual capacity;
SHEILA JOHNSON, in her individual
capacity; MS. KOZIOLEK, in her
individual capacity; SYED FATEH
HYDER, MD, in his individual capacity;
BENJAMIN RICE, MD, in his individual
capacity; LINDA LINDNER, MD, in her
individual capacity; S. TAYLOR, PA-C, in
their individual capacity; C. MEAD, NRP,
in their individual capacity; J. PETERSON,
BSN, in their individual capacity; HOLLY
SIETSMA, NRP, in their individual
capacity; T. WEISER, RN, in their
individual capacity; DANIELLE
SKOGLAND, RN, in their individual
capacity; JOHN and JANE DOES 1–10,
unknown BOP medical and custodial staff,

           Defendants.

---

Case No. 25-CV-____ (___/___)

JURY TRIAL DEMANDED

**COMPLAINT FOR DAMAGES UNDER THE FEDERAL TORT CLAIMS ACT
AND <u>BIVENS</u> ACTION FOR CONSTITUTIONAL VIOLATIONS AND
MINNESOTA STATE LAW**

## INTRODUCTION

1. This civil rights and wrongful death action arises from the preventable death of Starsha Silva, a 36-year-old mother of four, who died on May 24, 2023, while under the custody of the Federal Bureau of Prisons ("BOP") at the Federal Correctional Institution in Waseca, Minnesota ("FCI Waseca").

2. Ms. Silva died because federal officials and BOP employees failed to provide constitutionally adequate medical care, although external specialists at the Mayo Clinic diagnosed her with a life-threatening heart valve disease and recommended immediate surgical intervention.

3. This action asserts liability under the Federal Tort Claims Act ("FTCA") for wrongful death and medical malpractice and under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), for violation of Ms. Silva's Eighth Amendment rights due to the deliberate indifference of individual federal officials to her serious medical needs, as well as Minnesota state law.

4. The United States, as a matter of policy and custom, permitted non-medical personnel to override physician directives, failed to train its staff in the handling of emergent medical crises, and prioritized bureaucratic procedures and resource constraints over the immediate medical needs of incarcerated individuals.

5. Ms. Silva's death was not inevitable. She died in fear, as guards were pounding on her weakened chest during CPR. She passed deprived of treatment,

surrounded, not by family, but by institutional neglect. This lawsuit seeks justice for Ms. Silva and her surviving children and family members.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 for the constitutional claims brought under *Bivens*, and pursuant to 28 U.S.C. §§ 1346(b), 2671-2680 for claims under the FTCA. This Court has pendent jurisdiction over the Minnesota state law claims pursuant to 28 U.S.C. § 1367.

7. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and § 1402(b) because the events or omissions giving rise to the claims occurred in Waseca County, Minnesota, within the territorial jurisdiction of the District of Minnesota.

8. Plaintiff has satisfied the administrative exhaustion requirements of the FTCA by submitting a timely Standard Form 95 ("SF-95") on behalf of Ms. Silva's estate to the Bureau of Prisons. Six months have passed without disposition.

## PARTIES

9. Plaintiff Rylee Silva-Vidinha is the duly appointed Special Administrator of the Estate of Starsha Silva. Ms. Silva was a 36-year-old woman, mother of four children, all under 20, who was incarcerated at FCI Waseca at the time of her death. She suffered from serious congenital and acquired heart disease, which required surgical intervention.

10. Defendant United States of America is liable under the FTCA for the negligent acts and omissions of federal employees and agents, including medical personnel employed by the BOP.

11. Defendant Federal Bureau of Prisons ("BOP") is an agency of the United States responsible for the custody, care, and medical treatment of federal prisoners, including Ms. Silva. BOP operates FCI Waseca.

12. Defendant Warden Michael Segal was at all relevant times the Warden of FCI Waseca. He had supervisory authority over all staff, including correctional officers and medical providers. He is sued in her individual capacity under *Bivens* for her personal involvement and deliberate indifference.

13. Defendant Sheila Johnson was a nurse at FCI Waseca who participated in decisions regarding Ms. Silva's medical treatment and had Ms. Silva under her care. She is sued in her individual capacity.

14. Defendant Ms. Koziolek was Ms. Silva's case manager and accompanied her to a critical off-site medical appointment. She made decisions regarding Ms. Silva's access to medical care and overrode medical advice from physicians at Mayo Clinic and returned Ms. Silva to custody although the doctor recommended immediate surgery. She is sued in her individual capacity.

15. Syed Fateh Hyder, MD, was the Regional Medical Director for the Bureau of Prisons during the events in this case and oversaw the medical care provided at FCI Waseca. Ms. Silva was under his care. He is sued in his individual capacity.

16. Benjamin Rice, MD, was a medical doctor for the Bureau of Prisons during the events in this case. Upon information and belief, Ms. Silva was under his care. He is sued in his individual capacity.

17. Linda Lindner, MD, was a medical doctor for the Bureau of Prisons during the events in this case. Upon information and belief, Ms. Silva was under her care. She is sued in his individual capacity.

18. S. Taylor, PA-C, was a physician's assistant for the Bureau of Prisons during the events in this case. Upon information and belief, Ms. Silva was under their care. They are sued in their individual capacity.

19. C. Mead, NRP, was a medical provider for the Bureau of Prisons during the events in this case. Upon information and belief, Ms. Silva was under their care. They are sued in their individual capacity.

20. J. Peterson, BSN, was a medical provider for the Bureau of Prisons during the events in this case. Upon information and belief, Ms. Silva was under their care. They are sued in their individual capacity.

21. Holly Sietsma, NRP, was a medical provider for the Bureau of Prisons during the events in this case. Upon information and belief, Ms. Silva was under her care. She is sued in her individual capacity.

22. T. Weiser, RN, was a medical provider for the Bureau of Prisons during the events in this case. Upon information and belief, Ms. Silva was under their care. They are sued in their individual capacity.

23. Danielle Skogland, RN, was a medical provider for the Bureau of Prisons during the events in this case. Upon information and belief, Ms. Silva was under their care. They are sued in their individual capacity.

24. John and Jane Does 1–10 are unknown employees of the BOP whose identities are currently unknown, but who participated in or failed to intervene in the constitutional and medical violations described herein.

## FACTUAL ALLEGATIONS

25. FCI Waseca has a policy and practice of not providing adequate medical care due to perceived budget shortfalls and staffing shortages.

26. In May 2023, two weeks before Ms. Silva's death, the Department of Justice Office of Inspector General published a report on FCI Waseca based on an unannounced visit in February 2023.[1]

27. Among other concerning findings, the OIG found, "Health Services and Psychology Services Department vacancies affect the timeliness of inmate care and the availability of certain programs." Report at 3.

28. The report noted that FCI Waseca housed women that were beyond its capacity as a Medical Care Level 2 prison. Report at 2.

---

[1] Department of Justice Office of Inspector General, Inspection of the Federal Bureau of Prisoners' Federal Correctional Institution Waseca (May 2023), https://oig.justice.gov/sites/default/files/reports/23-068.pdf, hereinafter referred to as "Report".

29. The report states, "At the time of our inspection, there were 11 inmates classified at Medical Care Level 3 at FCI Waseca and 2 inmates classified at Mental Health Care Level 3." Report at 26.

30. The report states, "FCI Waseca houses inmates at care levels above those for which the institution is rated." Report at 28.

31. FCI Waseca was not able to provide for Ms. Silva's serious medical needs. Waseca medical knew that they could not care for Ms. Silva but took no action until it was too late.

32. The report also found that "the ability to transport inmates to outside medical appointments is dependent on the availability of FCI Waseca Correctional Officers and shortages in Correctional Officer staffing limit the number of outside medical trips FCI Waseca can support. This is because it is routinely Correctional Officers who must be available to escort inmates to each outside medical appointment and FCI Waseca generally requires two staff members, one of whom must be female, to accompany an inmate on an outside medical trip." Report at 28.

33. Warden Segal was responsible for overseeing all medical and correctional staff at FCI Waseca and ensuring that adequate medical care was provided to inmates. The OIG Inspection Report demonstrates that he knew about his prison's many shortcomings.

34. Warden Segal had actual knowledge of Ms. Silva's dire situation by May 2, 2023, when she filed a request for compassionate release.

35.     Warden Segal failed to intervene when he learned Ms. Silva needed immediate heart surgery and failed to respond to Ms. Silva's compassionate release request.

36.     Ms. Silva had a documented history of congenital heart disease, including a prior heart murmur and prior cardiac intervention. In the months leading up to her death, she was regularly reporting symptoms including fatigue, shortness of breath, and chest pain.

37.     On or around May 2, 2023, Ms. Silva was transported to Mayo Clinic with Ms. Koziolek for a cardiac consultation. There, she was diagnosed with severe valvular heart disease affecting both the tricuspid and aortic valves. The consulting physicians concluded that immediate surgical intervention was required and advised against returning Ms. Silva to prison without first performing the procedure.

38.     Despite the urgency of her condition and direct medical instructions, BOP employee Koziolek refused to allow the operation to go forward because, upon information and belief, two officers were needed to guard her during the operation and no staff was available.

39.     Koziolek forced Ms. Silva to return to FCI Waseca, reportedly stating to the doctor something to the effect of, "You don't know who my boss is," when the doctor protested the departure.

40.     Sheila Johnson, a nurse at FCI Waseca, was directly involved in Ms. Silva's medical care and cancelled preoperative appointments, despite knowing the

severity of Ms. Silva's heart condition and the Mayo Clinic's urgent recommendation for surgery.

41. Johnson's actions and omissions directly contributed to the delay in medical care, worsening Ms. Silva's condition.

42. Ms. Koziolek, Ms. Silva's case manager, was responsible for arranging and supervising off-site medical visits. Koziolek knowingly disregarded the urgent recommendation from Mayo Clinic physicians by prematurely returning Ms. Silva to the facility, because of, upon information and belief, the staffing needs that would be required for Ms. Silva's care. Koziolek's interference directly contradicted medical advice and contributed to the lack of timely surgical intervention.

43. Ms. Koziolek knew that Ms. Silva needed immediate surgery, yet for three weeks did nothing to schedule the procedure that she had stopped based on the supposed need for two officers to guard a patient undergoing open heart surgery.

44. Upon return to FCI Waseca, Ms. Silva submitted a written Compassionate Release request, which Warden Segal did not answer.

45. Medical staff, including Nurse Johnson, canceled preoperative appointments that were necessary to schedule surgery.

46. Ms. Silva continued to experience serious and emergent symptoms after May 2, 2023, including fatigue, shortness of breath, and chest pain.

47. There was no documented plan for further medical care despite her worsening symptoms.

48. Other incarcerated women reported that Ms. Silva appeared scared, disoriented, and physically weak in the weeks leading up to her death. She asked others to call her family and repeatedly expressed concern about dying in prison.

49. On May 24, 2023, Ms. Silva was instructed to "pack out." On information and belief, she was going to be transferred to Federal Medical Center Carswell in Fort Worth Texas, although she was not informed of her destination. The medical records do not indicate that a medical flight had been arranged or how she would survive multiple flights and time at the federal transit center in Oklahoma if the BOP followed normal procedures.

50. FCI Waseca's practice of transferring women with serious medical issues or ignoring their complaints caused Ms. Silva's death and violated her Eighth Amendment rights.

51. Ms. Silva was unmonitored while gathering her belongings.

52. Minutes later, she collapsed in her cell.

53. Other women on her unit found her blue and unresponsive.

54. Correctional officers administered Narcan and attempted CPR. However, Ms. Silva had a known structural heart issue and a chest compromised by prior surgery. CPR caused internal bleeding, and she died shortly thereafter.

55. An autopsy confirmed death due to complications of severe heart disease.

56. Her death was preventable had she received proper medical intervention including timely surgery as recommended.

57. Medical and prison staff were deliberately indifferent to Ms. Silva's urgent medical needs.

58. Medical and prison staff followed FCI Waseca policy that prioritized staffing rules over human life.

59. FCI Waseca's policies to house women who were greater than a care level 2 and to require two officers for outside medical appointments resulted in Ms. Silva's death.

60. Ms. Silva's children and family continue to suffer immense emotional and psychological harm from her preventable death.

61. On August 15, 2024, Plaintiff submitted to the Federal Bureau of Prisons a Standard Form 95 and Notice of Claim.

62. On October 17, 2024, Plaintiff submitted to the Federal Bureau of Prisons an amended Standard Form 95 and Notice of Claim, including additional information requested by letter from the Bureau of Prisons.

63. The Federal Bureau of Prisons received the amended Standard Form 95 and Notice of Claim on October 29, 2024.

64. As of April 29, 2025, six months have passed without a decision from the Bureau of Prisons, constituting an effective denial.

65. As of the date of this filing, Plaintiff has not received a decision from the Bureau of Prisons.

## CLAIMS FOR RELIEF

### Count I: Federal Tort Claims Act – Medical Malpractice / Wrongful Death

66. Plaintiff incorporates all prior allegations.

67. The BOP and its medical staff, acting within the scope of federal employment, failed to provide the requisite standard of care to Ms. Silva.

68. This failure includes ignoring expert recommendations, canceling treatment, and neglecting to monitor or treat her condition.

69. These acts and omissions constitute actionable negligence under Minnesota law and directly caused Ms. Silva's death.

### Count II: Eighth Amendment Violation – Deliberate Indifference (<u>Bivens</u>)

70. Plaintiff incorporates all prior allegations.

71. Defendants Segal, Johnson, and Koziolek knew of Ms. Silva's serious medical condition and the urgent recommendation for surgery yet failed to schedule the surgery.

72. Their decisions to delay, deny, and disregard her care constituted deliberate indifference in violation of the Eighth Amendment.

73. As a direct result, Ms. Silva experienced unnecessary pain, suffering, and a preventable death.

### Count III: Supervisory and Policy Claims Against the United States

74. Plaintiff incorporates all prior allegations.

75. The BOP permitted and maintained customs and practices whereby:

    a.    Non-medical staff could override physician recommendations;

    b.    Administrative policies took precedence over emergent health care needs;

    c.    Women with a care status of 3 were housed in FCI Waseca, a care 2 level prison; and

    d.    Incarcerated women with critical medical needs were treated with systemic neglect.

76. These practices directly contributed to the violations of Ms. Silva's rights and were the moving force behind her death.

77. The United States failed to train its staff in the handling of emergent medical crises, and prioritized bureaucratic procedures and resource constraints over the immediate medical needs of incarcerated individuals, causing her death.

### Count IV: State Law – Medical Malpractice (Minnesota Law)

78. Plaintiff incorporates all prior allegations.

79. Defendants owed Ms. Silva a duty of care consistent with Minnesota state medical standards.

80. By failing to provide appropriate medical care, Defendants breached this duty, directly causing Ms. Silva's injury and death.

### Count V: State Law – Wrongful Death (Minnesota Law)

81. Plaintiff incorporates all prior allegations.

82. Defendants' negligence directly resulted in the wrongful death of Ms. Silva, causing emotional and financial harm to her surviving family members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

    A. Enter judgment in favor of Plaintiff on all claims;

    B. Award compensatory damages for conscious pain and suffering, wrongful death, and loss of familial companionship;

    C. Award punitive damages against individual *Bivens* defendants;

    D. Award reasonable attorneys' fees and costs;

    E. Grant such other and further relief as the Court deems just and proper.

Dated: May 19, 2025

           LOEVY & LOEVY

           By: ___/s/ *Maria Makar*
           Maria Makar (pro hac vice forthcoming)
           Gianna Gizzi (pro hac vice forthcoming)
           311 North Aberdeen Street
           3rd Fl
           Chicago, Illinois 60607
           makar@loevy.com

           -and-

           THE LAW OFFICE OF
           JOSH JACOBSON, P.A.

           By: ___/s/ *Josh Jacobson*
           Josh Jacobson (#242585)
           120 South Sixth Street
           Suite 1515
           Minneapolis, Minnesota 55402
           Telephone: (612) 339-5111
           JoshJacobsonLaw@gmail.com

           -and-

           THE NATIONAL COUNCIL FOR
           INCARCERATED & FORMERLY
           INCARCERATED WOMEN AND GIRLS

           By: ___/s/ *Catherine* Sevcenko
           Catherine Sevcenko (pro hac vice forthcoming)
           300 New Jersey Ave NW
           Suite 900
           Washington, DC 20001
           Telephone: (617) 299-2604
           csevcenko@thecouncil.us

           *Attorneys for Plaintiff Rylee Silva-Vidinha as Personal Representative of the Estate of Starsha Silva and on her own behalf.*