UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 25-cv-02137-JRT-DTS

RYLEE SILVA-VIDINHA,

                    Plaintiff,                    **BRIEF IN SUPPORT OF
        v.                                        INDIVIDUAL DEFENDANTS'
                                                  MOTION TO DISMISS**
UNITED STATES OF AMERICA et al.,

                    Defendants.


This case arises out of the death of Starsha Silva in May 2023, while she was incarcerated at FCI-Waseca. Plaintiff Rylee Silva-Vidinha is Ms. Silva's adult daughter, and she alleges tort claims, constitutional violations, and state law causes of action. The federal government moved to dismiss on sovereign immunity grounds and substituted itself as the defendant for most of the claims asserted against various federal employees named in the complaint. This motion relates to the remaining *Bivens* claims against Defendants Michael Segal, Amanda Koziolek, Dr. Syed Fateh Hyder, Dr. Benjamin Rice, Dr. Linda Lindner, C. Mead, J. Peterson, Holly Sietsma, Tara Wieser, and Danielle Skogland (collectively, the "Individual Defendants").

Silva-Vidinha's claims are not cognizable under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). The complaint alleges personal involvement by just two of the Individual Defendants. Yet the claims arising out of those allegations challenge the application of agency policies rather than individual malfeasance. For the other eight Individual Defendants, Silva-Vidinha does not allege personal involvement in any constitutional violation and therefore fails to state *Bivens*

claims upon which relief can be granted. In addition to these deficiencies, Silva-Vidinha's claims against the Individual Defendants are barred by qualified immunity. Accordingly, the Court should dismiss Count II and dismiss the Individual Defendants from this case.

## STANDARD OF REVIEW

The Individual Defendants[1] move to dismiss Count II under Federal Rule of Civil Procedure 12(b)(6). In reviewing this motion, the Court accepts Silva-Vidinha's well-pled factual allegations as true and considers whether those allegations state any claim to relief that is plausible on its face. *See Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019). But the Court "need not accept as true a plaintiff's conclusory allegations or legal conclusions drawn from the facts," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (cleaned up). With this standard in mind, the Individual Defendants draw the following background from the complaint but do not concede the accuracy of Silva-Vidinha's allegations.

## BACKGROUND

### I.    BOP Policies and Ms. Silva's Medical Treatment

Silva-Vidinha frames this case as a challenge to BOP policies. Right up front, she accuses the United States of having a "policy and custom" of "permit[ing] non-medical personnel to override physician directives, fail[ing] to train its staff in the handling of emergent medical crises, and prioritiz[ing] bureaucratic procedures and resource constraints over the immediate medical needs of incarcerated individuals." Compl. ¶ 4.

---

[1]    Silva-Vidinha has not yet served Defendant Sherry Taylor, and the Department of Justice does not currently represent her.

From there, Silva-Vidinha alleges that "FCI Waseca has a policy and practice of not providing adequate medical care due to perceived budget shortfalls and staffing shortages." Compl. ¶ 25. The complaint also alleges that FCI-Waseca housed women "that were beyond its capacity as a Medical Care Level 2 prison" and was "not able to provide for Ms. Silva's serious medical needs." Compl. ¶¶ 25, 31. This is the context in which Silva-Vidinha's *Bivens* claims arise.

Ms. Silva was a federal inmate sentenced to 14 years in prison after pleading guilty to being a felon in possession of a firearm and possessing methamphetamine with intent to distribute. *See generally United States v. Silva*, No. 19-cr-89 (D. Haw. filed July 2, 2019). She was incarcerated at FCI-Waseca when she passed away on May 24, 2023. Compl. ¶ 1. According to the complaint, Ms. Silva had a "documented history of congenital heart disease." Compl. ¶ 36. To treat this condition, BOP personnel arranged for and transported Ms. Silva to a cardiac consultation appointment at Mayo Clinic in early May 2023. Compl. ¶¶ 36-37. Koziolek—a case manager at FCI-Waseca—escorted her. Compl. ¶¶ 14, 37. During the consultation, Ms. Silva was diagnosed with valvular heart disease and referred for surgery to redo a prior valve replacement. Compl. ¶ 37. The complaint alleges that Ms. Silva needed immediate surgery,[2] but Koziolek refused to allow doctors to perform the procedure because FCI-Waseca policy required that "two officers were needed to guard

---

[2]    The allegation that Ms. Silva needed ***immediate*** surgery is false. And Silva-Vidinha knows that because the United States gave her copies of Ms. Silva's medical records a few months ago. Nevertheless, Silva-Vidinha has not yet amended her complaint to remove the inaccurate allegation.

her during the operation and no staff was available." Compl. ¶¶ 32, 38, 42. Thus, Ms. Silva returned to FCI-Waseca after the appointment. Compl. ¶ 39.

Once Ms. Silva was back at FCI-Waseca, the complaint alleges that a federal contractor and others "canceled preoperative appointments that were necessary to schedule surgery." Compl. ¶ 45.[3] Ms. Silva also submitted a request for compassionate release during that time, but Warden Segal never responded to it. Compl. ¶ 44. On May 24, 2023, several weeks after her consultation at Mayo Clinic, Ms. Silva was packing her belongings for a transfer to FMC-Carswell (a care level three and four facility). Compl. ¶ 49. As she was packing, Ms. Silva collapsed. Compl. ¶ 52. Correctional officers and other medical personnel tried to revive her, but they were unable to do so. Compl. ¶ 54. Silva-Vidinha alleges that Ms. Silva died because "[m]edical and prison staff followed FCI Waseca policy that prioritized staffing rules over human life." Compl. ¶ 58.

## II.    Procedural History

Silva-Vidinha filed this case in May 2025, asserting causes of action against the United States, the BOP, the Individual Defendants, Sheila Johnson (who was a contractor), and Sherry Taylor. Dkt. 1. It took her awhile to serve the Individual Defendants, and the United States and BOP filed a motion to dismiss in the interim. Dkt. 15. That motion is scheduled for argument in January 2026. Dkt. 53.

---

[3]  Based on this allegation, Silva-Vidinha obviously knows that Mayo Clinic never recommended immediate surgery. "[P]reoperative appointments that were necessary to schedule surgery," would not have been required if Mayo Clinic had in fact ordered emergency surgery during the initial consultation.

After the Department of Justice approved representation for the Individual Defendants, their undersigned counsel contacted Silva-Vidinha's attorneys to request a meet-and-confer. The correspondence explained that Counts I, III, IV, and V cannot be asserted against the Individual Defendants because the Federal Tort Claims Act is the exclusive remedy for negligent acts or omissions of federal employees working in the scope of their employment. *See* 28 U.S.C. § 2679(b)(1). But Silva-Vidinha refused to dismiss any claims, insisting that the United States scope the Individual Defendants under the Westfall Act and substitute itself as the defendant for Counts I, III, IV, and V. The United States obliged, Dkt. 59, and has been automatically substituted. *See* 28 U.S.C. § 2679(d). The only claims left against the Individual Defendants are the *Bivens* claims in Count II.

## ARGUMENT

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court should dismiss Count II as alleged against the Individual Defendants. A fundamental problem is that none of Silva-Vidinha's claims are cognizable under *Bivens*. There are only two Individual Defendants for whom the complaint alleges any personal involvement in the supposed violation of Ms. Silva's rights: Warden Segal and Koziolek. But Silva-Vidinha's allegations make clear she is trying to extend the *Bivens* remedy into a new context that the Supreme Court has never authorized. For the rest of the Individual Defendants, the complaint does not allege any personal involvement and therefore fails to plead the elements of a *Bivens* claim. Pleading deficiencies aside, the other problem with Count II is that all Individual Defendants are entitled to qualified immunity because the complaint fails to allege the violation of a clearly established constitutional right. Whether for lack of

5

a *Bivens* remedy, on qualified immunity grounds, or for both reasons combined, Count II fails to state claims against the Individual Defendants upon which relief can be granted.

## I.    Lack of *Bivens* Remedy

Silva-Vidinha does not plead any viable cause of action under *Bivens*. For most of the Individual Defendants, she fails to allege any personal involvement in a constitutional violation. For Warden Segal, Silva-Vidinha's *Bivens* claims assert that he oversaw staff at FCI-Waseca, was generally responsible for ensuring inmates received medical care, and failed to respond to Ms. Silva's request for compassionate release. Compl. ¶¶ 33-35. For Koziolek, Silva-Vidinha's *Bivens* claims assert that she escorted Ms. Silva to Mayo Clinic in May 2023 and decided to bring her back to FCI-Waseca afterwards due to staffing shortages and institution policy. Compl. ¶¶ 37-39, 42-43, 58. None of these allegations state cognizable *Bivens* claims.

*Bivens* is narrow, limited to just three contexts in which the Supreme Court authorizes a remedy. *See Egbert v. Boule*, 596 U.S. 482, 490-91 (2022); *Ahmed v. Weyker*, 984 F.3d 564, 567 (8th Cir. 2020). In recent years, the Supreme Court has sharply warned against expanding the *Bivens* remedy to new contexts:

> When asked to imply a *Bivens* action, our watchword is caution. If there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy, the courts must refrain from creating it. Even a single sound reason to defer to Congress is enough to require a court to refrain from creating such a remedy.

*Egbert*, 596 U.S. at 491 (cleaned up). Federal courts must be mindful that "recognizing a cause of action under *Bivens* is a disfavored judicial activity." *Id.* (cleaned up). These principles require dismissing Silva-Vidinha's claims against Warden Segal and Koziolek.

## A.    The *Bivens* Analysis

This Court uses a two-step inquiry to determine whether Silva-Vidinha can pursue a *Bivens* remedy against Warden Segal and Koziolek.

First, the Court considers "whether the case presents a new *Bivens* context—i.e., is it meaningfully different from the three cases in which the [Supreme] Court has implied a damages action." *Egbert*, 596 U.S. at 492 (cleaned up). A claim can arise in a new context even when "based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Hernandez v. Mesa*, 589 U.S. 93, 103 (2020). The Supreme Court's "understanding of a 'new context' is broad," and the definition is not difficult to satisfy. *Id.* at 102. A case will present a new context unless it "exactly mirrors" the "facts and legal issues" of a Supreme Court case recognizing a *Bivens* cause of action. *Ahmed*, 984 F.3d at 568; *see also Fisher v. Hollingsworth*, 115 F.4th 197, 205 (3d Cir. 2024) ("[U]nless a case is indistinguishable from *Bivens, Davis*, or *Carlson*, a damages remedy may be created by Congress, but not by the courts."). Claims against a "new category of defendants" qualify as arising in a new context, *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001), as do claims with "significant parallels to" *Bivens*, *Davis*, or *Carlson* that seek just a "modest extension" of them, *Ziglar v. Abbasi*, 582 U.S. 120, 148 (2017). In other words, the first step in determining whether Silva-Vidinha's claims are cognizable under *Bivens* requires more than just checking to see if she alleges the same general type of constitutional violation that was at issue in one of the Supreme Court's prior *Bivens* cases.

Second, if a claim arises in a new context, then the Court considers whether "there are special factors indicating that the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed." *Egbert*, 596 U.S. at 492 (cleaned up). "If there is even a single reason to pause before applying *Bivens* in a new context, a court may not recognize a *Bivens* remedy." *Id.* (cleaned up). In virtually all cases, Congress will be better suited to decide if and how to create a damages remedy. *See Abbasi*, 582 U.S. at 135. The Eighth Circuit accordingly imposes on district courts "a presumption ***against*** judicial recognition of direct actions for violations of the Constitution by federal officials." *Farah v. Weyker*, 926 F.3d 492, 500 (8th Cir. 2019) (emphasis added) (cleaned up). Silva-Vidinha must overcome that presumption to proceed with her *Bivens* claims in this case.

As explained below, Silva-Vidinha's claims against Warden Segal and Koziolek arise in a new context. And there are several reasons to conclude that Congress is better equipped to decide whether a damages remedy is appropriate for the types of allegations she puts forward in this case. Thus, the Court should decline to extend the *Bivens* remedy here and dismiss Count II as to Warden Segal and Koziolek.

### B.    Warden Segal

Starting with Warden Segal, the complaint asserts *Bivens* claims based on his supervisory authority, overall responsibility for scheduling Ms. Silva's surgery, and failure to respond to Ms. Silva's request for compassionate release. Compl. ¶¶ 33, 35, 71. The first two allegations assert *Bivens* liability using a long-rejected theory of respondeat superior. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Government officials may not be held

liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*"). The third allegation arises in a new context for which the Supreme Court has not authorized a *Bivens* remedy.

### 1.    New Context

The only instance of Warden Segal's personal involvement mentioned in the complaint is that he failed to respond to Ms. Silva's request for compassionate release. Compl. ¶¶ 35, 44. This aspect of Count II should be dismissed because an Eighth Amendment claim premised on a warden's handling of a request for compassionate release would extend *Bivens* into a new context. The only conceivable comparator case is *Carlson v. Green*, which recognized a remedy for certain types of deliberate indifference claims brought by federal inmates. 446 U.S. 14 (1980). Although *Carlson* arose under the Eighth Amendment and in a prison setting, that is where the similarities to Silva-Vidinha's claims against Warden Segal end.

The appellate opinion leading to the Supreme Court's decision in *Carlson* set out the facts of the case in detail. 581 F.2d 669, 670-71 (7th Cir. 1978). Specifically, a federal inmate was transported to a non-BOP hospital due to his asthma. *Id.* at 671. After spending eight days in the hospital, the inmate's physician recommended that he be transferred to a BOP facility located in a more favorable climate. *Id.* But the inmate was not transferred, and a few weeks later he suffered a severe asthma attack and was admitted to his prison's hospital. *Id.* The inmate was not seen by a doctor for eight hours. *Id.* Eventually, a non-licensed nurse who was caring for the inmate left to dispense medication to another inmate and returned with a respirator that he knew to be broken. *Id.* The nurse then administered

two injections of a contraindicated medication for asthma attacks, shortly after which the inmate went into respiratory arrest. *Id.* A correctional officer brought emergency equipment so that he and the nurse could revive the inmate, but neither of them knew how to use the equipment. *Id.* The inmate was taken to a local hospital and pronounced dead upon arrival. *Id.*

Silva-Vidinha's allegations against Warden Segal are meaningfully different from those in *Carlson*. The Supreme Court does not require much before a case clears this threshold. *See Abbasi*, 582 U.S. at 139-40. Indeed, two key distinctions immediately apparent from the face of the complaint should be enough: (1) *Carlson* did not involve claims against a warden (who was dismissed early on for lack of service); and (2) *Carlson* did not involve compassionate release. Based only on those distinctions, this Court must conclude that the claims against Warden Segal are "new" because the Supreme Court has "consistently refused to extend *Bivens* liability to any new context or new category of defendants." *Malesko*, 534 U.S. at 68.

This case also meaningfully differs from *Carlson* because of the mechanism of constitutional injury that Silva-Vidinha alleges. *See Farah*, 926 F.3d at 499 (new *Bivens* context when "the mechanism of injury is different"). *Carlson* involved BOP personnel delivering (or failing to deliver) medical care directly to an inmate in acute respiratory distress. The Eighth Amendment violations were an initial failure to provide any medical care whatsoever and the later decision to provide medical care that was contraindicated and utilized broken machinery. *Carlson*, 581 F.2d at 670-71. In contrast, compassionate release is not a form of direct medical care that Warden Segal could have provided to Ms. Silva. It

is a statutory mechanism available to all inmates regardless of medical condition, through which the BOP's Director or an inmate can ask a sentencing court to order early release due to "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A)(i).

Equally important, compassionate release is not something that Warden Segal could have ordered unilaterally or instantly. There are BOP regulations setting out the process for requesting compassionate release, *see* 28 C.F.R. § 571.60 *et seq*., and it is ultimately up to an inmate's sentencing court to make a final ruling, *see* 18 U.S.C. § 3582(c). Compare that framework to *Carlson*, where the defendants could have made different in-the-moment medical treatment decisions that did not have to go through a multi-step process or final review by a federal judge. In other words, the type of decision giving rise to Silva-Vidinha's claims against Warden Segal is categorically different from the type of decision at issue in *Carlson*. *See Farah*, 926 F.3d at 499 (case presented a new context where the defendant's "actions injured the plaintiffs through a series of intervening steps"). That is another reason why this case meaningfully differs from any case where the Supreme Court has recognized a *Bivens* remedy.

### 2.    Special Factors

Because Silva-Vidinha's *Bivens* claims against Warden Segal arise in a new context, this Court considers whether there are any special factors that weigh against recognizing a new cause of action. The special-factors inquiry focuses on "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi*, 582 U.S. at 136. A *Bivens* claim cannot proceed if "is *any* rational reason (even one) to think that *Congress* is better suited"

for the task of weighing the relevant costs and benefits of allowing a damages claim to proceed. *Egbert*, 596 U.S. at 496 (original emphasis). In Silva-Vidinha's case, there are several reasons to think Congress is better equipped than the courts are.

First, Congress established a statutory framework to handle requests for compassionate release. *See* 18 U.S.C. § 3582(c). That fact alone answers the question of "'who should decide' whether to provide for a damages remedy, Congress or the courts?" *Abbasi*, 582 U.S. at 135. When "Congress has created any alternative, existing process for protecting the injured party's interest that itself may amount to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Id.* at 137 (cleaned up); *see also Egbert*, 596 U.S. at 493 ("[A] court may not fashion a *Bivens* remedy if Congress already has provided, or has authorized the Executive to provide, an alternative remedial structure." (cleaned up)). It is irrelevant that the compassionate release statute does not provide for money damages. As the Eighth Circuit explains, "even remedies that provide *no* compensation for victims and little deterrence for violators . . . trigger the general rule that, when alternative methods of relief are available, a *Bivens* remedy usually is not." *Farah*, 926 F.3d at 502 (original emphasis) (cleaned up).

Second, and related, Ms. Silva could have used the BOP's administrative remedy program to raise concerns about how quickly Warden Segal was addressing her request for compassionate release. *See* 28 C.F.R. § 542.10(a) ("The purpose of the Administrative Remedy Program is to allow an inmate to seek formal review of an issue relating to any aspect of his/her own confinement."); *id.* § 571.63 (denial of request for compassionate release is appealable through administrative remedy procedure); *Muniz v. United States*,

149 F.4th 256, 264 (3d Cir. 2025) ("[T]he availability of the BOP ARP is a 'special factor.'"). Again, when alternate remedies are available, federal courts cannot extend the *Bivens* remedy because the existence of even one alternative process "constitutes a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Minneci v. Pollard*, 565 U.S. 118, 125-29 (2012); *see also Abbasi*, 582 U.S. at 145. In fact, this Court regularly points to the BOP's administrative remedy program when refusing to allow federal inmates to pursue *Bivens* claims. *See, e.g.*, *Mount v. Fikes*, 2023 U.S. Dist. LEXIS 133761, at *9 (D. Minn. Aug. 2, 2023); *Jones v. Fedo*, 2021 U.S. Dist. LEXIS 254734, at *13-14 (D. Minn. Dec. 31, 2021), *adopted by* 2022 U.S. Dist. LEXIS 39740 (D. Minn. Mar. 7, 2022); *Hardy v. Bureau of Prisons*, 2019 U.S. Dist. LEXIS 118213, at *7 (D. Minn. June 10, 2019), *adopted by* 2019 U.S. Dist. LEXIS 118315 (D. Minn. July 15, 2019).

Third, authorizing *Bivens* remedies against BOP wardens who deny requests for compassionate release will "require courts to interfere in an intrusive way with sensitive functions of the Executive Branch." *Abbasi*, 582 U.S. at 141; *see also* Program Statement 5050.50, *Compassionate Release/Reduction in Sentence Procedures* (Jan. 17, 2019), *available at* https://www.bop.gov/policy/progstat/5050_050_EN.pdf (setting forth program objectives, detailed request procedures, and factors to consider for compassionate release). The risk of such interference is a factor that weighs against extending a *Bivens* remedy because Congress—rather than the courts—is better equipped to "weigh the costs and benefits of allowing a damages action to proceed" in those circumstances. *Egbert*, 596 U.S. at 492. This concern is particularly important in the context of BOP operations or

*Bivens* claims that would risk disrupting day-to-day operations at federal prisons. *See Sheng-Wen Cheng v. Grenier*, 2024 U.S. Dist. LEXIS 7310, at *9 (D. Minn. Jan. 16, 2024) (no remedy for claims that "would likely exponentially increase litigation against BOP officials, further increasing the resources consumed during a lengthy period of litigation"), *aff'd* 2024 U.S. App. LEXIS 21073 (8th Cir. Aug. 21, 2024); *Mount*, 2023 U.S. Dist. LEXIS 133761, at *9 (no remedy for claims that "would interfere with the functioning of the executive branch—another valid justification for this Court's hesitation").

\* \* \*

The Court should not extend the *Bivens* remedy to Silva-Vidinha's claims against Warden Segal. Those claims arise in a new context, and there are special factors present suggesting that Congress is better equipped to decide if a damages remedy is appropriate.

### C.    Case Manager Koziolek

Turning to Koziolek, Silva-Vidinha alleges that she escorted Ms. Silva to a medical appointment during which a physician recommended immediate surgery. Compl. ¶ 37. But Koziolek—who was Ms. Silva's case manager and not a medical professional—decided to return Ms. Silva to FCI-Waseca due to "staffing needs" and a policy that required two correctional officers to be present for the operation. Compl. ¶¶ 38-39. Although these allegations might sound similar to *Carlson* at a high level, there are significant differences that make Silva-Vidinha's *Bivens* claims against Koziolek arise in a new context. And once again, there are special factors that caution against extending the *Bivens* remedy. Thus, Count II as alleged against Koziolek should be dismissed in its entirety.

### 1.      New Context

Silva-Vidinha's claims against Koziolek ask the Court to recognize a new type of *Bivens* action. The Eighth Amendment violation for which she seeks damages is a case manager's decision to follow institution policy requiring two officers to be present for medical procedures. Compl. ¶¶ 38, 42-43, 58-59. No Supreme Court case has allowed a *Bivens* claim based on a challenge to the faithful adherence to agency policy—*Carlson* certainly did not do so. *See Bulger v. Hurwitz*, 62 F.4th 127, 138 (4th Cir. 2023) (claim was different from *Carlson* where it implicated "organizational policies, administrative decisions, and economic concerns inextricably tied to" an inmate's treatment). Quite the opposite: the Supreme Court emphasizes that "a *Bivens* action is not 'a proper vehicle for altering an entity's policy.'" *Abbasi*, 582 U.S. at 140. Federal courts allow *Bivens* remedies only in cases of discrete constitutional violations by individuals against individuals.

Silva-Vidinha's policy-based challenge is fundamentally different from *Carlson*, and creating a *Bivens* cause of action here would have fundamentally different repercussions. For example, if allowed to proceed, Count II "would call into question the formulation and implementation of a general policy. This, in turn, would necessarily require inquiry and discovery into the whole course of the discussions and deliberations that led to the policies and governmental acts being challenged." *Id.* at 141. The potential consequences of undertaking such an inquiry "counsel against allowing a *Bivens* action against the Executive Officials, for the burden and demand of litigation might well prevent them—or, to be more precise, future officials like them—from devoting the time and effort required for the proper discharge of their duties." *Id.* Moreover, unlike in *Bivens*, there is

an alternative path to challenge the existence of an agency policy: a suit for injunctive relief. *Id.* at 144; *see also Johnson v. Terry*, 119 F.4th 840, 858 (11th Cir. 2024) ("As the Court found in *Ziglar*, we find that the context of these claims is different from the context of the claim in *Carlson* because there the Court did not consider whether there were alternative remedies under the current alternative remedy analysis.").

As pled, Silva-Vidinha's claims against Koziolek implicate the management of a complex system of prison healthcare. The complaint dives into interactions between prison staff who schedule appointments and outside medical providers, the allocation of resources for transporting and escorting inmates to appointments outside of secured facilities, and agency staffing policies and requirements. Federal courts are ill-suited to provide guidance on how the BOP should balance and manage such issues, and Silva-Vidinha's invitation to do so here puts the Court into a new *Bivens* context. *See Turner v. Safley*, 482 U.S. 78, 84-86 (1987); *Sargeant v. Barfield*, 87 F.4th 358, 367 (7th Cir. 2023) (new context where the plaintiff's claim "factor[ed] in a sensitive mixture of things [courts] are ill-positioned to assess—a prison's determinations about safety, discipline, and resources.").

Even if federal courts could oversee such decisions, doing so would involve a greater "risk of disruptive intrusion by the judiciary" into prison functions than *Carlson* involved. *Abbasi*, 582 U.S. at 140. The Supreme Court does not allow the use of *Bivens* actions to obtain judicial supervision of BOP decisions about how to administer medical care to inmates; courts are not suited to evaluate how differing resource, medical, and security constraints play out in the context of individual treatment decisions for an inmate. *See id.* at 140-41. "The heightened risk of intrusive judicial inquiry into an area that has

been committed to the responsibility of the political branches distinguishes this case from *Carlson* and provides another reason to conclude that it presents a new *Bivens* context." *Kalu v. Spaulding*, 113 F.4th 311, 329 (3d Cir. 2024) (citing *Turner*, 482 U.S. at 85).

There are also ways in which the claims against Koziolek present a new context at a granular level. Many of the points that distinguish Silva-Vidinha's claims against Warden Segal from the claims in *Carlson* hold true for the allegations against Koziolek. It does not matter that Silva-Vidinha asserts a violation of the same constitutional amendment. It does not matter that she is suing employees of the same federal agency. And it does not matter that her claims broadly challenge medical care in the prison setting. *See Ahmed*, 984 F.3d at 570 ("When one or more meaningful differences exist, it is not enough to identify a few similarities."). The Supreme Court is emphatic that "superficial similarities are not enough to support the judicial creation of a cause of action," *Egbert*, 596 U.S. at 495, and "even a modest extension is still an extension," *Abbasi*, 582 U.S. at 147. "If the test sounds strict, it is." *Ahmed*, 984 F.3d at 570. Close scrutiny of Silva-Vidinha's claims against Koziolek shows that they differ from those authorized in *Carlson* in several key respects.

To start, Silva-Vidinha's claims against Koziolek propose expanding *Bivens* liability to a new category of defendants. Koziolek was Ms. Silva's case manager, Compl. ¶ 14, not a medical professional and not a frontline correctional officer.[4] That fact

---

[4] Case managers and correctional officers perform different duties. In particular, case managers handle programming, classification, and recordkeeping aspects of an inmate's incarceration rather than day-to-day custodial supervision. *See* Program Statement 5321.09, CN-1 *Unit Management and Inmate Program Review* (Feb. 27, 2025), *available at* https://www.bop.gov/policy/progstat/5321_009_cn-1.pdf.

immediately makes this case different from *Carlson*, where the defendants were a medical director, an unlicensed nurse, and a correctional officer who assisted the unlicensed nurse in trying to resuscitate the plaintiff. Koziolek is outside the category of defendants against whom the Supreme Court has authorized a *Bivens* remedy, which is a meaningful difference. *See Malesko*, 534 U.S. at 68.

The distinctions become even more apparent when considering the mechanism of injury in *Carlson*. As noted above, *Carlson* arose out of medical care provided directly to the plaintiff by BOP medical personnel (and a correctional officer who assisted in providing that care). *See Carlson*, 581 F.2d at 670-71. The deliberate indifference alleged in *Carlson* was allowing an inmate to go untreated in a prison hospital for eight hours while he suffered from an asthma attack because no doctor was on duty or called in. And then an unlicensed nurse provided contraindicated medication and tried to revive the inmate using equipment that neither he nor an assisting correctional officer knew how to use. That is not the kind of claim Silva-Vidinha alleges here. Nothing in the complaint says that Koziolek provided inadequate or contraindicated medical care to Ms. Silva or failed to provide medical care that she would have been able or qualified to provide when Ms. Silva was in acute distress. *Cf. Cavan v. United States*, 2022 U.S. Dist. LEXIS 50374, at *28 (D. Minn. Jan. 31, 2022) ("Plaintiff's purported 'deliberate indifference' claims do not allege a failure to provide medical care."), *adopted by* 2022 U.S. Dist. LEXIS 49847 (D. Minn. Mar. 21, 2022). Rather, the headline allegation is that Koziolek decided to return Ms. Silva to FCI-Waseca after a medical appointment because of staffing issues. Compl. ¶¶ 14, 38-39.

Analyzed allegation-to-allegation and considered in terms of Silva-Vidinha's big-picture challenge to BOP policy, this case is simply not the same as *Carlson*. When these differences are considered in the aggregate, the claims against Koziolek undeniably present a new *Bivens* context. *See Quinones-Pimentel v. Cannon*, 85 F.4th 63, 72 (1st Cir. 2023) ("[A]ll the differences identified above, when viewed in the aggregate, are sufficient reason to conclude Appellants' three counts are each an extension of *Bivens*.").

### 2.   Special Factors

Two of the special factors that foreclose extending *Bivens* remedies to Silva-Vidinha's claims against Warden Segal also foreclose extending those remedies to her claims against Koziolek. First, there are alternative remedies available through the BOP's administrative remedy program. Second, authorizing deliberate indifference claims against non-medical personnel outside the context of providing direct medical care to inmates in acute distress will interfere with sensitive functions of the Executive Branch. Because the presence of just one special factor precludes extending *Bivens*, these points dispose of Count II as alleged against Koziolek. *See Egbert*, 596 U.S. at 496. But one additional factor warrants emphasis.

According to the complaint, Koziolek returned Ms. Silva to FCI-Waseca due to BOP policy and staffing issues. Compl. ¶¶ 38, 42. That allegation on its own gives the Court a compelling reason to pause before extending a *Bivens* remedy in this case. Count II as alleged against Koziolek invites the Court to weigh-in on questions about a federal agency's resource allocation and staffing procedures. Those are policy-laden issues, for which Congress is far better equipped to provide guidance and decide whether and how to

authorize private remedies. This Court acknowledged the exact point in *Henny v. United States*, refusing to extend *Bivens* to an inmate's Eighth Amendment deliberate indifference claims. 2023 U.S. Dist. LEXIS 226378, at *5-6 (D. Minn. Dec. 20, 2023). The opinion dismissing the inmate's complaint observed that

> extending *Bivens* to cover claims arising out of alleged understaffing at federal prisons is precisely the type of "special factor" that should cause the Court to pause. Should Congress wish to extend *Bivens*-like liability to claims by inmates regarding staffing levels at federal prisons, and the effect of those staffing levels on prison conditions, it will do so. This Court cannot unilaterally make that determination, however, and Henny's claims under *Bivens* fail.

*Id.* at *6. Other courts identify similar factors when refusing to extend *Bivens* remedies. *See Santiago v. United States*, 2025 U.S. Dist. LEXIS 220149, at *10 (E.D. Pa. Nov. 5, 2025) (no *Bivens* remedy because it would "involve prison procedure for determining how to balance the priorities of security (i.e., restraint procedures) and emergency medical care"); *Hardy*, 2019 U.S. Dist. LEXIS 118213, at *8 (no *Bivens* remedy because it would "implicate[] BOP policies regarding security measures, access to programming, and staffing resources").

Put differently, Silva-Vidinha's claims against Koziolek turn on an alleged tension between a doctor's recommendation and BOP policies. The complaint places that issue front and center, alleging that "FCI Waseca has a policy and practice of not providing adequate medical care due to perceived budget shortfalls and staffing shortages." Compl. ¶ 25. Then Silva-Vidinha focuses on a May 2023 report describing medical care at FCI-Waseca and noting the facility's staffing challenges. Compl. ¶¶ 26-33. As discussed above, Silva-Vidinha's strategy puts Count II beyond the intended use of *Bivens*, "which

[the Supreme Court has] never considered a proper vehicle for altering an entity's policy [because] injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally." *Malesko*, 534 U.S. at 74.

The combined weight of these factors shows that Congress is in the best position to decide if and how to provide a damages remedy for Silva-Vidinha's claims. That result is required "[w]hen an issue involves a host of considerations that must be weighed and appraised[;] it should be committed to those who write the laws rather than those who interpret them." *Abbasi*, 582 U.S. at 135-36 (cleaned up).

\* \* \*

The Court should not extend the *Bivens* remedy to Silva-Vidinha's claims against Koziolek. Those claims arise in a new context, and there are special factors present suggesting that Congress is better equipped to decide if a damages remedy is appropriate.

### D.    Lack of Personal Involvement

The rest of Count II suffers from a different *Bivens*-related pleading deficiency. Silva-Vidinha fails to allege personal involvement in a violation of Ms. Silva's rights. That is a basic requirement for *Bivens* claims. "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676; *see also Harper v. Segal*, 2025 U.S. Dist. LEXIS 44722, at \*21 (D. Minn. Feb. 3, 2025) ("Plaintiff's failure here to plead factual allegations demonstrating any personal involvement of the named FCI Waseca Defendants in her medical care warrants the dismissal of this claim."), *adopted by* 2025 U.S. Dist. LEXIS 38151 (D. Minn. Mar. 4, 2025). The complaint does not any describe personal involvement

by Dr. Fateh Hyder, Dr. Rice, Dr. Lindner, Mead, Peterson, Sietsma, Wieser, or Skogland, and Count II should be dismissed as to those defendants. Aside from the allegations about compassionate release, the same is true for Silva-Vidinha's claims against Warden Segal.

### 1.    The Other Individual Defendants

There are just three substantive paragraphs in Count II, and all of them concern Warden Segal, Johnson, and Koziolek:

1.  Warden Segal, Johnson, and Koziolek knew about Ms. Silva's medical condition and failed to schedule her surgery;

2.  The decision to delay the surgery constituted deliberate indifference; and

3.  Ms. Silva experienced pain, suffering, and death due to the delay.

Compl. ¶¶ 71-73. None of the other Individual Defendants are mentioned in Count II, and Silva-Vidinha does not explain how they were responsible for any decision to "delay, deny, and disregard" Ms. Silva's care in violation of the Eighth Amendment. Compl. ¶ 72. Thus, it is not even clear that Silva-Vidinha means to assert *Bivens* claims against anyone other than Warden Segal, Johnson, and Koziolek. That is reason enough to dismiss Count II as to the remaining Individual Defendants and dismiss them as parties to this case.

Incorporating the rest of the complaint, Compl. ¶ 70, does not solve the problem. Other than the caption, the names of Dr. Fateh Hyder, Dr. Rice, Dr. Lindner, Mead, Peterson, Sietsma, Weiser, and Skogland appear ***just once***. Compl. ¶¶ 15-23. Those appearances are purely introductory. Silva-Vidinha lists the position each person held and offers the same conclusory statement that "[u]pon information and belief, Ms. Silva was under [his/her/their] care." Compl. ¶¶ 15-23. This Court routinely dismisses *Bivens* claims at the pleadings stage when plaintiffs offer such bare-bones allegations that do not describe

personal involvement. *See, e.g.*, *Jackson v. United States*, 2020 U.S. Dist. LEXIS 35244, at *43 (D. Minn. Jan. 27, 2020) (complaint made "only thread bare, generalized allegations" without alleging personal involvement"), *adopted by* 2020 U.S. Dist. LEXIS 34455 (D. Minn. Feb. 28, 2020); *Hussein v. Barr*, 2019 U.S. Dist. LEXIS 159855, at *13-14 (D. Minn. July 31, 2019) ("[T]here is not a single factual allegation describing or even suggesting personal involvement . . . [i]ndeed, Whitaker and Wray are not mentioned at all beyond being listed in the case caption and identified as parties to the lawsuit."), *adopted by* 2019 U.S. Dist. LEXIS 158990 (D. Minn. Sep. 18, 2019); *Currie v. Jett*, 2015 U.S. Dist. LEXIS 57750, at *4 (D. Minn. Mar. 25, 2015) ("[T]he only reference to Nelson in Currie's pleading outside of the caption is that he is the director of FMC-Rochester's medical staff."), *adopted by* 2015 U.S. Dist. LEXIS 56529 (D. Minn. Apr. 30, 2015). Silva-Vidinha's complaint should meet the same fate.

The *Bivens* claims against Dr. Fateh Hyder, Dr. Rice, Dr. Lindner, Mead, Peterson, Sietsma, Wieser, and Skogland in Count II fail as a matter of law because there is no allegation that they were personally involved in a constitutional violation. Because personal involvement is an essential pleading requirement for a *Bivens* claim, the Court should dismiss Count II as alleged against these eight Individual Defendants.[5]

---

[5] Silva-Vidinha's claims against Dr. Fateh Hyder, Dr. Rice, Dr. Lindner, Mead, Peterson, Sietsma, Wieser, and Skogland also cannot proceed under *Bivens* because it is impossible to determine from the complaint whether her claims arise in a new context. Without any specific allegations directed to these defendants, a special factors analysis is impractical and unnecessary.

2.      **Warden Segal**

To the extent Silva-Vidinha's *Bivens* claims against Warden Segal are based on something other than refusing to grant compassionate release (which is not a cognizable claim), those claims fail because his supervisory authority does not lead to *Bivens* liability. Just like the requirement to allege personal involvement, it is black-letter law that "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior." *Iqbal*, 556 U.S. at 676; *see also Buford v. Runyon*, 160 F.3d 1199, 1203 (8th Cir. 1998) ("[T]here is no respondeat superior liability in *Bivens* actions; defendants are liable for their personal acts only."). And just like the other Individual Defendants, Silva-Vidinha does not allege facts showing that Warden Segal was personally involved in decisions regarding Ms. Silva's medical care.

This Court consistently dismisses *Bivens* claims against BOP wardens—including Warden Segal—that are based only on supervisory authority. *See, e.g.*, *Harper*, 2025 U.S. Dist. LEXIS 44722, at *21 (dismissing *Bivens* claim because "Plaintiff alleges that the FCI Waseca Defendants are liable here solely because of their supervisory position on the prison staff at FCI Waseca"); *Ricketts v. Maggard*, 2019 U.S. Dist. LEXIS 228884, at *17 (D. Minn. Dec. 16, 2019) ("Just because Birkholz is the Associate Warden of Medical does not mean he can be sued for the allegedly illegal acts of his subordinates."), *adopted by* 2020 U.S. Dist. LEXIS 42302 (D. Minn. Mar. 11, 2020). Count II is no different. Silva-Vidinha wants to hold Warden Segal liable under the Eighth Amendment because he "was responsible for overseeing all medical and correctional staff at FCI Waseca and ensuring that adequate medical care was provided to inmates." Compl. ¶ 33. That doesn't work.

*Bivens* liability requires personal involvement in a constitutional violation, rather than mere supervisory authority. The Court should dismiss this aspect of Silva-Vidinha's *Bivens* claims against Warden Segal.

## II.      Qualified Immunity

In addition to pursuing deficient *Bivens* claims, Count II fails as a matter of law because of qualified immunity. The lack of allegations against Dr. Fateh Hyder, Dr. Rice, Dr. Lindner, Mead, Peterson, Sietsma, Wieser, and Skogland makes it virtually impossible to analyze if they are entitled to qualified immunity. Those defendants should nevertheless be dismissed because it is Silva-Vidinha's obligation to show that they violated a clearly established constitutional right. She has not satisfied that obligation. And despite offering more detailed allegations for Warden Segal and Koziolek, it is clear from the complaint that Silva-Vidinha's claims against them are barred by qualified immunity.

### A.      The Qualified Immunity Standard

Qualified immunity "shields a government official from suit" when that official's conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Kelsay v. Ernst*, 933 F.3d 975, 979 (8th Cir. 2019) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It is Silva-Vidinha's burden to overcome qualified immunity at the pleading stage by alleging "facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Dillard v. O'Kelley*, 961 F.3d 1048, 1052 (8th Cir. 2020) (en banc) (cleaned up). To meet this standard, she "must identify controlling authority or a robust consensus of cases of persuasive authority placing the

25

[applicable] constitutional question beyond debate." *Rudley v. Little Rock Police Dep't*, 935 F.3d 651, 653 (8th Cir. 2019) (quotations omitted). Particularly given how directly Silva-Vidinha wants to challenge BOP policies and the Individual Defendants' adherence to them, the Court should be mindful that qualified immunity provides government officials "ample room for mistaken judgments" by shielding from suit "'all but the plainly incompetent or those who knowingly violate the law.'" *Stewart v. Wagner*, 836 F.3d 978, 984 (8th Cir. 2016) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)).

Silva-Vidinha does not satisfy the first requirement for overcoming qualified immunity as to most of the Individual Defendants. She does not plead facts showing that Dr. Fateh Hyder, Dr. Rice, Dr. Lindner, Mead, Peterson, Sietsma, Wieser, or Skogland did ***anything***—let alone allege that they violated Ms. Silva's rights. The same goes for most of Silva-Vidinha's claims against Warden Segal. On that basis, the Court should dismiss almost all of Count II on qualified immunity grounds.

### B.    Clearly Established Constitutional Right

For the few instances in which Silva-Vidinha describes acts or omissions by Warden Segal and Koziolek, the complaint does not allege the violation of clearly established constitutional rights. Courts "do not 'define clearly established law at a high level of generality.'" *Thurmond v. Andrews*, 972 F.3d 1007, 1012 (8th Cir. 2020) (quoting *Dillard*, 961 F.3d at 1052). Instead, Silva-Vidinha must identify "a controlling case or a robust consensus of cases of persuasive authority. There need not be a prior case directly on point, but 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Dillard*, 961 F.3d at 1052).

No "robust consensus of cases" clearly required Warden Segal to approve compassionate release for Ms. Silva or respond to her request within a certain timeframe. *See* Compl. ¶ 35. And no law clearly required Koziolek—who, again, is a case manager rather than a medical provider—to unilaterally violate alleged BOP policy by scheduling an immediate surgery for Ms. Silva without proper staffing. Compl. ¶¶ 37-39. It is Silva-Vidinha's "burden to show that [a] right was clearly established at the time of the alleged violation." *Quraishi v. St. Charles County*, 986 F.3d 831, 835 (8th Cir. 2021). She cannot do so here. Qualified immunity therefore shields Warden Segal from *Bivens* liability for refusing to address Ms. Silva's request for compassionate release, and it shields Koziolek from *Bivens* liability for returning Ms. Silva to FCI-Waseca because of BOP policy.

## CONCLUSION

Count II fails to plead any claim against the Individual Defendants upon which relief can be granted. The Court should dismiss Silva-Vidinha's *Bivens* claims and dismiss the Individual Defendants as parties to this case.

Dated: December 19, 2025

DANIEL N. ROSEN
United States Attorney

  *s/ Trevor Brown*

BY:  TREVOR C. BROWN
Assistant United States Attorney
Attorney ID Number 396820
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN  55415
(612) 664-5600
trevor.brown@usdoj.gov